## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **cPANEL, LLC**, a Texas limited liability company,<br><br>               Plaintiff,<br><br>      v.<br><br>**HESAM ASLI**, an individual, and **SIAVASH DASHTI**, an individual,<br><br>            Defendants. | Case No. 3:22-cv-01963-IM<br><br>**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Venkat Balasubramani and Ashley J. McDonald, Focal PLLC, 900 1st Ave. S., Suite 201, Seattle, WA 98134. Attorneys for Plaintiff.

Parna A. Mehrbani and Stephanie J. Grant, Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, OR 97204-2099. Attorneys for Defendant Dashti.

**IMMERGUT, District Judge.**

      Before this Court is Plaintiff cPanel, LLC's motion for preliminary injunction against

Defendants Hesam Asli, who has yet to appear, and Siavash (or Siavosh) Dashti, who has

appeared through counsel. Plaintiff's Motion for Preliminary Injunction ("PI Mot."), ECF 44.

Plaintiff alleges that Defendants have infringed its copyrights and trademark; trafficked

PAGE 1 – OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

copyright-circumventing technology in violation of the Digital Millennium Copyright Act ("DMCA"); counterfeited its trademark; and cybersquatted in violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"). *Id.* at 15. As relief, Plaintiff asks this Court to preliminarily enjoin Defendants and "those working in active concert with them" from continuing their alleged activities, transferring any domains, and moving any assets until this case's resolution. *Id.* at 35–36. Plaintiff also asks this Court to preliminarily enjoin specific non-party service providers—such as Google, Cloudflare, Porkbun, and Private by Design—and unnamed, non-party financial institutions from providing their services to Defendants. *Id.*

Defendant Dashti does not contest Plaintiff's motion on the merits. Instead, Defendant Dashti contends that the motion is moot and that there is no risk of irreparable harm because he has promised to make inaccessible any potentially infringing domains and not to transfer those domains. Defendant Dashti's Response ("Resp."), ECF 57 at 4–5. Defendant Dashti also argues that the requested injunction is overbroad because it nominally extends to non-parties. *Id.* at 4. To resolve these disputes, this Court held oral argument on November 29, 2023. ECF 70.

Exercising jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k), this Court GRANTS in part and DENIES in part Plaintiff's motion. Plaintiff satisfies the four prerequisites to a preliminary injunction: it is likely to succeed on the merits; the public interest and balance of the equities weigh in its favor; and Plaintiff has suffered and likely will continue to suffer irreparable harm absent a preliminary injunction. The motion is not moot, moreover, despite Defendant Dashti's promise. But at this stage, this Court will not name specific non-parties in the injunction, enjoin financial institutions who have no knowledge of Defendants' activities, nor freeze assets unrelated to any infringing domains. Plaintiff has not justified such an injunction as a matter of law.

PAGE 2 – OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## BACKGROUND

The facts below are undisputed unless otherwise noted. All factual findings at this stage of the case are preliminary.

### A.  Plaintiff cPanel's Business Model and Software

Plaintiff cPanel is a Texas limited liability company that develops and sells software. Declaration of Jesse Asklund ("Asklund Decl."), ECF 9 ¶ 3. As relevant here, Plaintiff has developed a hosting automation software that provides users a graphical interface and automated tools for managing and hosting websites ("the cPanel software"). *Id.* Plaintiff's consumers are hosting providers, developers, and small- and medium-sized businesses worldwide. *Id.* ¶ 4.

Plaintiff has devoted substantial time, money, and effort to developing customer goodwill for the cPanel software. *Id.* Plaintiff's success stems from its high-quality products and technical support services, as well as positive word of mouth among users. *Id.* Since the cPanel software's launch in the mid-1990s, Plaintiff has made millions of dollars in sales worldwide. *Id.*

To protect its intellectual property, Plaintiff has registered several trademarks and copyrights. *Id.* ¶¶ 5, 6. Plaintiff has used the trademark "CPANEL" in commerce since 1998 to identify "computer software for facilitating the management and configuration of internet web servers." First Amended Complaint, ECF 30, Ex. A. And, it has registered the copyright to two versions of its software with the U.S. Copyright Office. Asklund Decl., ECF 9 ¶ 6.

Plaintiff controls the distribution, marketing, and sale of its software through its website. *Id.* ¶ 7. For an individual to use the cPanel software beyond a limited trial basis, she must buy a license from Plaintiff. *Id.* ¶ 8. The license permits Plaintiff to verify that a customer is using a valid, authorized version of the cPanel software. *Id.* The license also acts as a barrier to illegal copying and distribution of the cPanel software. *Id.*

Users can buy a cPanel license through Plaintiff's website <cpanel.net> and subscribe to varying pricing plans. *Id.* ¶ 9. Users can also purchase licenses through authorized third-party distributors and partners. *Id.* Plaintiff exercises oversight over these third parties and their marketing of the cPanel software. *Id.*

To prevent bad actors from selling illicit cPanel licenses, Plaintiff has an internal investigation team that examines information from unauthorized use of the cPanel software and tracks potential fraud cases. *Id.* ¶ 10. One way Plaintiff learns of illicit licenses is through cPanel software users who seek technical support for licenses that turn out to be illicit. *Id.* ¶ 11.

This is how Plaintiff discovered an illicit cPanel license-seller named "Licenseman." *Id.* Licenseman, Plaintiff alleges, is in fact two people: Defendants Asli and Dashti.[1]

## B. Defendants' Alleged Unlawful Conduct as "Licenseman"

### 1. The Licenseman Domains and Websites

Licenseman primarily sells the illicit cPanel licenses through the domain name <licenseman.net>. *Id.* In total, Licenseman currently runs nine websites that advertise and sell illicit licenses, which, like Plaintiff, this Court will refer to as the "Category One" domains or sites: (1) <licenseman.net>; (2) <license-cpanel.net>; (3) <hackcpanel.com>; (4) <colonelhost.com>; (5) <colonelhost.net>; (6) <cheap-license.net>; (7) <licenseflare.net>; (8) <averdad.net>; and (9) <1license.org>. Declaration of Venkat Balasubramani ("Third Balasubramani Decl."), ECF 46 ¶¶ 5–14, Exs. 2–17.

Two of the domains <license-cpanel.net> and <hackcpanel.com> incorporate the CPANEL mark in their name. Two other domains, <colonelhost.com> and <colonelhost.net>,

---

[1] Throughout the facts section, this Court will refer to Licenseman as an individual entity.

state that Licenseman "operates in" Los Angeles, Miami, and New York. [2] *Id.* Exs. 6–7. Five of

the nine Category One sites display prices in U.S. dollars. *Id.* Exs. 3, 4, 6, 7, 11. Seven of the

nine Category One sites are in English. *Id.* Exs. 2, 4, 5, 6, 9, 10, 13. And five of the nine

Category One sites take payment via U.S.-based payment processor PayPal. *Id.* ¶¶ 5–7, 10–11.

Licenseman advertises the fact that it is selling illicit cPanel licenses. For example,

<hackcpanel.com> expressly states, "how to get free cPanel license, bypass cPanel license and

get lifetime cPanel license easy." *Id.* Ex. 5. For another example, <licenseman.net> has a "How

It Works" page explaining how Licenseman makes illicit cPanel licenses available:

> [A]fter a while, we realized that many users like us are not able to
> pay and use the licenses of some companies completely and it is
> not profitable for them. So we decided to launch a complete system
> to enable the company's licenses to be shared with the public at a
> lower price.
>
> For example, we buy an original cPanel license and use that tunnel
> to use the license for three servers.

*Id.* Ex. 17. On the same page, Licenseman also advertises that its licenses "are no different from

the original licenses and only cost less." *Id.* It cautions, however, that "[s]upport is not possible

through the original site." *Id.*

The Category One sites are administered by another set of five sites, which, like Plaintiff,

this Court will refer to as the "Category Two" sites or domains: (1) <paymenter.me>; (2)

<crediter.gift>; (3) <keys.gift>; (4) <netroot.co>; and (5) <siavash.pro>. *Id.* Exs. 18–22. These

sites, among other things, permit Licenseman to receive payment through the Category One sites.

*Id.* ¶¶ 15–20.

---

[2] <colonelhost.net> redirects to <colonelhost.com>. Third Balasubramani Decl., ECF 46
¶ 8.

## 2. How the Illicit Licenses Work

To investigate the illicit licenses, Plaintiff hired John Lightsey, an independent

consultant, to examine computers with cPanel software installed through the illicit licenses.

Declaration of John Lightsey ("Lightsey Decl."), ECF 8 ¶¶ 6–10. Mr. Lightsey was asked to

document (i) how Licenseman has altered the cPanel software and its license verification logic

and (ii) Licenseman's techniques for avoiding detection. *Id.* ¶ 9.

According to Mr. Lightsey, Licenseman has altered the cPanel software's binary code in

several ways. Any requests to Plaintiff's licensing and technical support systems are rerouted to

servers controlled by Licenseman. *Id.* ¶ 11. Trial banners, which notify users that trial licenses

are reaching their expiration date, are hidden. *Id.* The modified software automatically uninstalls

itself if Plaintiff's technical support staff logs into a server on which the illicit software is

installed. *Id.* The modified software's binary files "wrap" around the normal binary files that

conduct license updates and license verifications. *Id.* ¶ 12. And the resulting "wrapped binaries"

direct the cPanel software to servers other than those laid out in the normal binary files. *Id.* So,

during license verification, the "wrapped binaries" accept licenses that were issued to other

cPanel systems. *Id.* In sum, the "wrapped binaries" allow multiple individuals to use the same

cPanel license to operate the cPanel software. *Id.*

## 3. Licenseman's Attempts to Escape Detection

Licenseman has taken several measures to avoid revealing the identities of the people

behind its scheme. Its primary site <licenseman.net> does not provide a physical address; the site

states only that Defendants are located "somewhere on the internet." Third Balasubramani Decl.,

ECF 46 Ex. 2. The site provides an email address (info@licenseman.net) and an account name

(@licenseman) for the instant messaging service Telegram. *Id.*

Moreover, the Category One and Category Two Domains are registered anonymously through Porkbun LLC. Declaration of Venkat Balasubramani ("Second Balasubramani Decl."), ECF 40 ¶ 5. The registrant is listed as Private by Design LLC, which is Porkbun's associated privacy service. *Id.* The domain name behind <licenseman.net> was previously registered through Name.com's associated privacy service, Domain Protection Services, Inc. *Id.* ¶ 9. And the contact information and addresses Licenseman gave to Porkbun, Private by Design, and other non-party service providers all appear to be false or incomplete. Declaration of Venkat Balasubramani ("First Balasubramani Decl."), ECF 35 ¶¶ 8(c), 8(e), 9(f), 10(e), 11(b) (cataloging attempts to track down these addresses and contact information to no avail).

Since Plaintiff began tracking Licenseman's activities, Licenseman's efforts to shield itself from scrutiny have increased. The modified cPanel software "calls back" to cPanel's own license server less often than the regular software. Asklund Decl., ECF 9 ¶ 17. Licenseman now monitors the IP addresses of potential customers for illicit cPanel licenses and refuses to sell licenses if the purchaser's IP address is one assigned to Plaintiff. *Id.* And Licenseman can detect when one of Plaintiff's support representatives logs into the server on which the illicit licenses are installed. *Id.* Licenseman will then disable those licenses. *Id.* These measures have stymied Plaintiff's attempts to track and investigate Licenseman. *Id.*

According to Plaintiff's estimates, Licenseman is using approximately 6,500 unpaid cPanel licenses to create its illicit licenses, which in turn equates to approximately 600,000 cPanel users, amounting to a monetary loss of $ 250,000 per month. *Id.* ¶ 24.

## C. Defendants' Involvement with the Licenseman Domains

Despite Licenseman's attempts to escape detection, Plaintiff—through subpoenas to various service providers—uncovered Defendants Asli and Dashti's involvement with the domains and sites selling and advertising illicit cPanel licenses. Second Balasubramani Decl.,

PAGE 7 – OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ECF 40 ¶¶ 5–6. Defendant Asli is named as the billing, technical, administrative, and registrant contact for the domains. *Id.* ¶ 5(b). Licenseman's primary website <licenseman.net> was previously registered to Defendant Dashti through Name.com. *Id.* ¶ 9(a). Defendant Dashti is the billing contact for the Cloudflare account used to administer the Category One and Two domains. *Id.* ¶ 10(a). The payment method on file with Cloudflare for the Licenseman domains is a credit card under Defendant Dashti's name. *Id.* ¶ 10(b). The physical address Porkbun has on record for the Licenseman domains is a fake address in Apeldoorn, Netherlands, but Defendant Dashti gave the same fake address to Porkbun, Name.com, and Cloudflare. *Id.* ¶¶ 5(c), 5(g), 9(d), 10(d). Finally, both Defendants gave their individual email addresses to non-parties that have provided their services to the Licenseman domains. *Id.* ¶¶ 5(b), 9, Ex. 10 at 3.

In uncovering Defendants' identities, Plaintiff found evidence suggesting that Defendant Asli resides in the United Arab Emirates and that Defendant Dashti resides in the Netherlands. *See* First Balasubramani Decl., ECF 35 ¶¶ 8–11, 13 (identifying these countries through I.P. addresses, country codes for phone numbers, and the identifiable portions of partial addresses).

Defendant Dashti alleges, without providing any evidence, that he "had no involvement in cracking licenses, advertising them, selling them, making websites for those licenses, or receiving payment for them." Declaration of Siavash Dashti ("Dashti Decl."), ECF 58 ¶ 5. He also alleges, again without factual support, that he is "not creating, selling, advertising, or doing anything to aid in the distribution of hacked cPanel licenses." *Id.* ¶ 11. Yet Defendant Dashti does admit that he permitted Defendant Asli to use his Visa number to "set up various websites and accounts," *id.* ¶ 5, and that he runs the Porkbun account that hosts the sites described above, *id.* ¶ 6. He alleges that Defendant Asli "administered" <licenseman.net>; <license-cpanel.net>; <hackcpanel.com>; <cheap-license.net>; <licenseflare.net>; and <1license.org>. *Id.* ¶ 7.

Defendant Dashti says he "cannot control the content" of any of the websites he hosts, but effectively admits that he can make the domains listed above unavailable or transfer them. [3] *Id.* ¶¶ 9–10; *see* Resp., ECF 57 at 3.

**D. Procedural Background**

Plaintiff first filed suit on December 21, 2022 against unnamed John Does. Complaint, ECF 1. Two days later, Plaintiff filed an ex parte motion for a temporary restraining order, ECF 7, which this Court denied with leave to renew, ECF 13. Plaintiff renewed its ex parte motion for a temporary restraining order, ECF 15, and this Court denied this motion as well, but granted Plaintiff leave to conduct expedited discovery to uncover the individuals behind <licenseman.net>, ECF 18. Plaintiff twice received leave to conduct additional discovery, ECF 23, ECF 28, before finally identifying Defendants Asli and Dashti, ECF 29.

In its First Amended Complaint, Plaintiff has made six claims: (1) copyright infringement under 17 U.S.C. § 106; (2) trafficking in circumvention devices under 17 U.S.C. § 1201(a)(2); (3) trademark infringement under 15 U.S.C. § 1114; (4) trademark counterfeiting under 15 U.S.C. § 1114; (5) unfair competition under 15 U.S.C. § 1125(a); and (6) cybersquatting under 15 U.S.C. § 1125(d). Plaintiff's First Amended Complaint, ECF 30 ¶¶ 40–98. For its remedy, Plaintiff has sought a permanent injunction, delivery of materials, an equitable accounting, and various forms of damages. *Id.* at 19–21 (Prayer for Relief).

---

[3] Defendant Dashti's Porkbun account hosts fifteen other domains that are not relevant here. The account hosts seven domains that sell and advertise illicit licenses for software other than the cPanel software. PI Mot., ECF 44 at 10–11. The account also hosts eight domains that are not currently being used to sell or advertise any illicit licenses: (1) <irpezeshki.com>; (2) <gandivpn.com>; (3) <goldnull.com>; (4) <pornzart.com>; (5) <mametala.com>; (6) <label-white.com>; (7) <4tst.me>; and (8) <maxbase.org>. *Id.* at 11; Third Balasubramani Decl., ECF 46 ¶¶ 28–35, Exs. 30–35. Defendant Dashti alleges that these sites "are for things entirely unrelated to cPanel licenses, like medical care in Iran, music, hobbies, etc." Dashti Decl., ECF 63 ¶ 8.

Plaintiff moved for leave to effectuate service by alternative means—specifically, email—on Defendants under Federal Rule of Civil Procedure 4(f)(3). ECF 34. This Court granted Plaintiff's motion for alternative service. ECF 42. Plaintiff then filed a third ex parte motion for a temporary restraining order, which this Court denied. ECF 43. Plaintiff filed the instant motion for a preliminary injunction on August 16, 2023, ECF 44, and on the same day, issued its alternative summons to Defendants, ECF 47. On September 7, 2023, counsel appeared on Defendant Dashti's behalf. ECF 48, ECF 49. This Court set a briefing schedule for Defendant Dashti to respond to Plaintiff's preliminary injunction motion, ECF 50, which was extended at the Parties' request, ECF 54. This Court held oral argument on the Motion on November 29, 2023. ECF 70. During the oral argument, this Court provided Plaintiff the opportunity to file supplemental briefing on whether this Court could enjoin non-parties to this case, *id.*, and Plaintiff took that opportunity, *see* Plaintiff's Supplemental Brief ("Pl.'s Supp."), ECF 71.[4]

Defendant Asli has yet to appear, and Plaintiff filed a motion for entry of default against him, ECF 55, which this Court granted, ECF 60.

## DISCUSSION

This Opinion proceeds as follows. Section A explains why this Court has personal jurisdiction over Defendants. Section B explains how Plaintiff has satisfied the four *Winter* factors. Section C explains why this Court will modify Plaintiff's proposed injunction to avoid overbreadth. And Section D explains why this Court will not require Plaintiff to post bond.

---

[4] Defendant Dashti was given an opportunity to express his position on Plaintiff's Supplemental Brief, but he does not intend to file additional briefing on the instant Motion. Pl.'s Supp., ECF 71 at 2.

**A. Jurisdiction: This Court Has Personal Jurisdiction Over Defendants Under Federal Rule of Civil Procedure 4(k)**

This Court has "a duty to assure itself of its own jurisdiction, regardless of whether jurisdiction is contested by the parties." *West v. United States*, 853 F.3d 520, 522 (9th Cir. 2017) (citation omitted). In considering its jurisdiction, this Court must take Plaintiff's allegations as true and resolve any factual disagreements in Plaintiff's favor. *See Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). Accordingly, this Court will presume for its jurisdictional analysis that Defendants are behind the Licenseman entity.

Under Federal Rule of Civil Procedure 4(k)(2), a federal court may exercise jurisdiction over a foreign defendant if the claim arises under federal law; the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction follows due process. *Will Co. v. Lee*, 47 F.4th 917, 922 (9th Cir. 2022). Here, Plaintiff's claims doubtless arise under federal law. And the evidence heavily suggests that neither Defendant is subject to a state's jurisdiction—indeed, Defendant Dashti notably did not contest this Court's jurisdiction in his opposition to Plaintiff's motion. *See Holland Am. Line Inc. v. Wartsila N.A., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007) ("If . . . the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001))). Thus, the dispositive question is whether jurisdiction comports with due process.

As Plaintiff recognizes, the purposeful direction test for specific jurisdiction controls here. *See* PI Mot., ECF 44 at 32; *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) ("A purposeful direction analysis . . . is most often used in suits sounding in tort," rather than those sounding in contract). Under that test, jurisdiction over a defendant satisfies due process when (i) the defendant "purposefully directs" its activities at the forum (i.e., the United

States), (ii) the lawsuit arises out of or relates to the defendant's forum-related activities, and (iii) the exercise of jurisdiction is "reasonable." *Will Co.*, 47 F.4th at 922 (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227–28 (9th Cir. 2011)); *see Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021) ("Under Rule 4(k)(2), . . . [courts] consider contacts with the nation as a whole." (citation omitted)). This Court considers each prong in turn.

### 1. Purposeful Direction of Activities at the Forum

Defendants purposefully directed their activities at the United States. For there to have been purposeful direction, Defendants must "allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that [they] know[] is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). Defendants have committed several intentional acts—buying cPanel licenses, manipulating them, creating multiple domains, and selling fake licenses.

Those acts were expressly aimed at the United States, and Defendants likely knew that the harm would be suffered in the United States. The facts here are dispositively similar to those in *Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2563 (2023). There, the Ninth Circuit held that the district court had personal jurisdiction over VNG, a Vietnamese corporation, under Rule 4(k). The Ninth Circuit reasoned that VNG had targeted the United States by specifically seeking content owned by a U.S. Corporation, releasing its offending product to consumers in the United States, "contract[ing] with U.S. businesses," and failing to "limit U.S. users' ability to access its" offending product. 40 F.4th at 1041–42. In the Ninth Circuit's view, moreover, these actions, as well as a letter by VNG acknowledging its desire to work with U.S. content owners, evidenced that VNG knew its actions would inflict harm in the United States. *Id.* at 1042–43.

The evidence here yields the same conclusion as in *Lang Van*. To start, Defendants targeted the intellectual property and trademark of a U.S. company, cPanel. Defendants likely received notice of Plaintiff's domicile in the United States because, to launch their illicit business, they would have needed to buy cPanel's licenses. In selling their product, moreover, Defendants contracted with various U.S. businesses such as Porkbun, Private by Design, PayPal, and Cloudflare. And, Defendants have not limited U.S. users' access to their websites and product—in fact, Plaintiff's U.S.-based investigator could access Defendants' websites. Finally, Defendants' websites are in the English language, post prices in U.S. dollars, hold themselves out as offering services in the United States, and permit payment through U.S.-based payment processors. *See Will Co.*, 47 F.4th at 925 (holding that there was knowledge of harm in part because "the webpages [defendants] posted on the site that address legal compliance are relevant almost exclusively to viewers in the United States"). Therefore, as a matter of Ninth Circuit precedent, Defendants purposefully directed their activities to the United States.

### 2. Arising Out of or Relating to Defendants' Forum-Related Activities

Plaintiff's claims "arise out of or relate to" Defendants' "contacts with the" United States. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quotation marks and citation omitted). The evidence—that Defendants' websites are in English, use U.S.-based purchasing processors, take payment in U.S. dollars, and are not geo-locked from the United States—suggests that the intended end-users of Defendants' illicit product and websites are U.S.-based. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014) (holding that the requisite affiliation exists when a defendant "deliberately exploit[s] a market in the forum" (brackets, quotation marks, and citation omitted)). And Defendants have contracted with and used U.S.-based payment processors, domain registrars, and proxy services. *See id.* (holding that the requisite affiliation exists when a defendant "enter[ed] a contractual relationship that envisioned continuing and

PAGE 13 – OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

wide-reaching contacts in the forum" (quotation marks and citation omitted)). These actions "relate to" all of Plaintiff's claims. *See, e.g.*, *Ayla*, 11 F.4th at 983 (holding that similar commercial activity by a defendant is "related to" a trademark claim); *Mavrix Photo*, 647 F.3d at 1228 (same for copyright claim).

Defendants' U.S.-based actions distinguish this case from this Court's recent decision in *Alhathloul v. DarkMatter Group*, where this Court declined to exercise personal jurisdiction over defendant DarkMatter, an Emirati company. Case No. 3:21-cv-01787-IM, 2023 WL 2537761 (D. Or. Mar. 16, 2023). There, DarkMatter had allegedly hacked plaintiff Alhathloul's iPhone through malware, and Alhathloul asserted that DarkMatter's transmission of the malware through Apple's servers conferred this Court with personal jurisdiction over DarkMatter. *Id.* at *2–3, *9. Yet, as this Court explained, the alleged transmission alone was insufficient because DarkMatter was only alleged to have had a relationship with the United States through its decision to use Apple's servers—DarkMatter did not deliberately form relationships with the United States in order to install malware on Alhathloul's phone (as alleged). *Id.* at *9. In addition, Alhathloul did not "plead with sufficient specificity" as to how DarkMatter's other U.S.-based contacts—such as employing employees in the United States or contracting with U.S. companies—were related to the conduct that "ultimately underpin[ned]" Alhathloul's claim. *Id.* Accordingly, this Court dismissed the Alhathloul plaintiff's complaint without prejudice with leave to amend. *Id.* at *11.

Here, by contrast, Defendants deliberately targeted the U.S. market and, to that end, formed contracts and business relationships with U.S.-based entities. Defendants bought Plaintiff's license and trafficked circumvented portions of its technology as a crucial part of their

commercial scheme of selling counterfeit cPanel licenses in the United States. Thus, Plaintiff's claims arise out of and relate to Defendants' deliberate forum-related activities.

### 3. The Reasonableness of Jurisdiction

At this step, the burden now "shifts to [Defendants] to set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)). Defendant Asli has not appeared, however, and Defendant Dashti makes no attempt to argue that jurisdiction here would be unreasonable. Accordingly, this Court will presume that jurisdiction here, at least for purposes of deciding this motion, is reasonable.

\* \* \*

In total, the evidence shows that Defendants have purposefully directed their activities to the United States and that Plaintiff's claims arise out of Defendants' activities in the United States. This Court therefore has jurisdiction to resolve this motion for a preliminary injunction.

## B. The Merits: Plaintiff Has Satisfied the Four *Winter* Factors

A plaintiff seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011). Even if a plaintiff cannot show a definitive likelihood of success on the merits, "[a] preliminary injunction is appropriate when [the] plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citation omitted).

For the reasons below, Plaintiff carries its burden. Defendant Dashti does not challenge this, except to argue that Plaintiff's motion is moot, but Defendant's argument lacks merit.

**1. Likelihood of Success on the Merits**

Plaintiff makes five claims for: (i) copyright infringement; (ii) the trafficking of circumvention devices in violation of the DMCA, 17 U.S.C. § 1201(a)(2); (iii) trademark infringement and unfair competition under 15 U.S.C. § 1114, 1125(a);[5] (iv) trademark counterfeiting under 15 U.S.C. § 1114; and (v) cybersquatting under ACPA, 15 U.S.C. § 1125(d). Each of the cited statutes authorizes injunctive relief against infringers. *See* 17 U.S.C. § 502 (copyright); 17 U.S.C. § 1203(b) (trafficking in circumvention devices); 15 U.S.C. § 1116 (trademark, unfair competition, and cybersquatting).

Plaintiff is likely to succeed on all five of its claims, in light of the overwhelming evidence indicating that Defendants were behind the actions of the Licenseman entity. *Supra* at 7–9. To be sure, Defendant Dashti alleges in his declaration that he does not control the content of the Category One sites and that he was not involved in infringing Plaintiff's trademark or copyright. ECF 63 ¶¶ 5, 11. This Court need not credit this statement, however, which is "conclusory and unsupported by any evidence." *Doe v. Trump*, 284 F. Supp. 3d 1172, 1177 (W.D. Wash. 2018); *see also Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (explaining that findings must be "grounded in . . . evidence," not "cursory and conclusory").[6] This Court therefore will attribute the Licenseman entity's actions to both Defendants.

---

[5] Although Plaintiff's Complaint separates trademark infringement and unfair competition as two different claims, as shown below, the legal tests for both are identical.

[6] In any event, a preliminary injunction against Defendant Asli must run against Defendant Dashti under Federal Rule of Civil Procedure 65(d), which permits injunctions against aiders and abettors, *infra* at 24–26. Defendant Dashti provided his credit card and his Porkbun account to maintain the infringing websites. Further, Defendant Dashti has never denied knowing the content of the infringing websites—indeed, given his concessions, it is not believable that he

### a. Copyright Infringement

"Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007) (citation omitted). cPanel has registered its copyright in its software and thus owns the allegedly infringed material. *See* 17 U.S.C. § 410(c) (explaining that registration is "prima facie evidence of the validity of the copyright"). As a result, cPanel has the exclusive right "to prepare derivative works based upon the copyrighted work." *Id.* § 106(2). That right was violated by Defendants, who altered the cPanel software to permit access via illicit licenses. *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 938–39 (N.D. Cal. 2009) (explaining that "deletions, modifications, and additions to software result in an infringing derivative work"), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).

### b. Trafficking Under the DMCA

A defendant is liable under the DMCA when she "(1) traffics in (2) a technology or part thereof (3) that is primarily designed, produced, or marketed for, or has limited commercially significant use other than (4) circumventing a technological measure (5) that effectively controls access (6) to a copyrighted work." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 953 (9th Cir. 2010) (citing 17 U.S.C. § 1201(a)(2)), *as amended*, 2011 WL 538748 (2011). To circumvent means to "bypass . . . or impair a technological measure," 17 U.S.C. § 1201(a)(3)(A), and protected "technological measures" include "license key system[s]," *Synopsys, Inc. v.*

---

did not know. Thus, even on Defendant Dashti's terms, Defendant Dashti knowingly aided Defendant Asli in the illicit cPanel license scheme.

*InnoGrit, Corp.*, Case No. 19-CV-02082-LHK, 2019 WL 4848387, at *7 (N.D. Cal. Oct. 1, 2019). Here, Defendants sell re-engineered, illicit cPanel licenses that, as advertised, manipulate the binary of the cPanel software so that people can use the cPanel software without purchasing a subscription from Plaintiff. And Defendants traffic—that is, sell—such licenses via their websites. Thus, every element of DMCA trafficking liability has been met here.

### c.   Trademark Infringement & Unfair Competition

"To establish a trademark infringement claim under section 32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham Act, [Plaintiff] must establish that [Defendants] [are] using a mark confusingly similar to a valid, protectable trademark of [Plaintiff's]." *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) (citation omitted); *see id.* at 1053–54 (noting that relevant factors for confusion include the similarity of the designations, proximity of the goods sold, evidence of actual confusion, and the degree of care purchasers exercise in selecting goods). Plaintiff has registered its CPANEL mark, which is prima facie evidence of an exclusive mark, *see* 15 U.S.C. § 1115(a), and used the mark in commerce since 1998.

Defendants' actions here are highly likely to confuse consumers. They are using the same CPANEL marks on their websites and in their domain names, all to sell licenses to Plaintiff's software. *See Brookfield*, 174 F.3d at 1066 ("When a firm uses a competitor's trademark in the domain name of its web site, users are likely to be confused as to its source or sponsorship."). And the fact that illicit license users have sought Plaintiff's customer service suggests that users have actually been confused and not exercised a great deal of care in pursuing cPanel licenses. Accordingly, Plaintiff has established a likelihood of success on its trademark infringement and unfair competition claims under the Lanham Act.

### d. Trademark Counterfeiting

To succeed on a claim of trademark counterfeiting, Plaintiff must show that "the mark in question" is "(1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946 (9th Cir. 2011) (citation omitted). Plaintiff amply satisfies this test. The CPANEL mark identifies computer software facilitating the management and configuration of internet web servers, and Defendants are using that exact mark to sell illicit licenses to Plaintiff's software.

### e. Cybersquatting

Under ACPA, Plaintiff must prove that "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (footnote omitted). Plaintiff alleges that Defendants are liable under ACPA for two of the Category One domains: <hackcpanel.com> and <license-cpanel.net>.

Plaintiff is correct. The domains incorporate the CPANEL mark, and Defendants used the domain names to sell infringing items, which in itself proves bad faith. *See AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.*, 748 F. App'x 115, 119 (9th Cir. 2018); *Hand & Nail Harmony, Inc. v. Int'l Nail Co.*, CASE NO.: CV 15-02718 SJO (AJWx), 2015 U.S. Dist. LEXIS 67421, at *26 (C.D. Cal. May 22, 2015) (finding bad faith "where the only goods or services offered for sale on the website appear to infringe upon the plaintiff's trademarks" (quotation marks and citation omitted)).

### 2.  Irreparable Harm/Mootness

Plaintiff has proven irreparable harm in three ways. First, "[b]y statute, [Plaintiff] is entitled to a rebuttable presumption of irreparable harm on its trademark claim because the company has shown that it will likely succeed on the merits." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 694 (9th Cir. 2022) (citing 15 U.S.C. § 1116(a)). Defendants have not attempted to rebut this presumption. Second, "[i]n the DMCA context, irreparable harm may be established by evidence that circumvention is . . .  threatening the copyright owner's business model, . . . causing reputational harm to the copyright owner or its works, and/or enabling third parties to infringe the owner's copyrights." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1074 (S.D. Cal. 2019) (citations omitted). As the evidence shows, Defendants' circumvention of Plaintiff's software has (i) damaged Plaintiff's reputation with users who have sought Plaintiff's customer support, (ii) threatened Plaintiff's business model of selling subscriptions to its licenses, and (iii) enabled Defendants to infringe Plaintiff's copyright. And third, Defendants' efforts to disguise themselves are further evidence of irreparable harm. *See Microsoft Corp. v. Premier Selling Techs.*, No. C15-463RAJ, 2015 WL 1408915, at *3 (W.D. Wash. Mar. 26, 2015) (finding irreparable harm where defendants had "gone to great lengths to hide themselves and the assets that are the fruits of their unlawful conspiracy").

Defendant Dashti does not contest Plaintiff's irreparable harm arguments on substantive grounds. Rather, Defendant submits that Plaintiff's "motion is moot as to Mr. Dashti, and there is no risk of irreparable harm to cPanel from Mr. Dashti." Resp., ECF 57 at 1. In Defendant Dashti's view, because he has made "all the domains in Plaintiff's Appendix A inaccessible to the public" and has "voluntarily agree[d] not to" transfer any domains or re-open the domains until the "parties reach a permanent resolution," Plaintiff cannot allege any irreparable harm, thus mooting the preliminary injunction motion. *Id* at 3. Further, Defendant submits, this matter

is moot because, upon receiving notice of Plaintiff's Preliminary Injunction Motion, Porkbun disabled access to Defendant Dashti's domains.[7] Plaintiff counters that the voluntary cessation exception to mootness applies here. Reply, ECF 62 at 5–7.

Plaintiff has the better of the arguments. Defendant Dashti has not shown that this matter is moot, and Plaintiff has accordingly met its burden of proving irreparable harm. "Contrary to [Dashti's] assertion, . . . it is actually well-settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, *if there is a possibility of recurrence*, since otherwise the defendant[s] would be free to return to their old ways." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999) (internal quotation marks, citations, and original brackets omitted). Thus, "[t]he standard for the voluntary cessation exception to mootness is 'whether the defendant is free to return to its illegal action at any time.'" *Id.* at 1238 (quoting *Pub. Utils. Comm'n of Cal. v. Fed. Energy Reg. Comm'n*, 100 F.3d 1451, 1460 (9th Cir. 1996)). Defendant Dashti bears the heavy burden of showing that there is no possibility of recurrence of the infringing activity. *See Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir. 2004).

He cannot carry it, so Plaintiff's motion is not moot. Defendant Dashti's promise to keep the Category A domains shut down and not transfer them is merely that: a promise. And this promise appears only in his legal briefing. It appears nowhere in his declaration, which only mentions that he is not "doing anything to aid in the distribution of hacked cPanel licenses." Dashti Decl., ECF 58 at 3. Absent an injunction, Defendant Dashti would be free to renege his ostensible promise and re-open the domains and transfer them. He could also acquire domains with a new domain name registrar. Given Defendants' well documented infringement of Plaintiff's intellectual property and their efforts to disguise their identities and avoid detection—

---

[7] This argument was first raised at oral argument.

including through Defendant Dashti's use of Private by Design—the threat of irreparable harm remains.

The analysis is not altered by the fact that a third-party, Porkbun, disabled access to the infringing websites. The Ninth Circuit's decision in *Demery*, 378 F.3d 1020, is instructive. There, a police sheriff was sued for streaming live images from cameras installed in a county jail, but before the district court could issue a preliminary injunction, the website hosting the images was shutdown. *Id.* at 1025. Nonetheless, the district court issued the injunction, and on appeal, the Ninth Circuit affirmed, holding that the case had not been rendered moot by the website's shutting down. Because the sheriff still intended to stream county jail images on another website, the Ninth Circuit reasoned, the case was not moot even though "the defendant's cessation of the disputed activity was not in the short term voluntary, as it was not [defendant] who discontinued" the website. *Id.* at 1026. That reasoning applies with full force here. Despite Porkbun's actions, Defendant Dashti still must show that the infringing activity will not recur absent an injunction. Since he has not, Plaintiff's motion is not moot.

### 3. Balancing of the Equities

Plaintiff has proven several ways that it would continue to suffer irreparable harm in the absence of a preliminary injunction. Defendants have alleged none, and in any event, "a defendant who builds a business model based upon a clear violation of the property rights of the plaintiff cannot defeat a preliminary injunction by claiming the business will be harmed if the defendant is forced to respect those property rights." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069 (N.D. Cal. 2000); *see Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits

little equitable consideration on [a motion for a preliminary injunction]." (citation and quotation marks omitted)), *superseded by statute on other grounds*, 17 U.S.C. § 117(c).

### 4. Public Interest

Upholding copyright and trademark protections against willful infringers is in the public interest. *See Warner Bros. Home Ent. Inc. v. Jacek*, Case No. CV 13-04065 DMG (JCx), 2013 WL 12134186, at *5 (C.D. Cal. Dec. 20, 2013) ("[A]n injunction is in the public interest because it protects the holders of valid copyrights and discourages copyright infringement."); *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1029 (C.D. Cal. 2011) ("[T]he public has a strong interest in being free from the confusion caused by unauthorized use of [valid] marks.").

*    *    *

Plaintiff, in sum, has satisfied all four of the *Winter* factors. And contrary to Defendant Dashti's assertions, the motion for preliminary injunction is not moot. Accordingly, this Court will grant Plaintiff's motion for preliminary injunction.

### C. Remedy: Plaintiff's Requested Preliminary Injunction is Overbroad and Must Be Modified

However, this Court holds that Plaintiff's requested preliminary injunction is overbroad and thus will not grant it in its present form. *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) ("[A]n overbroad preliminary injunction is an abuse of discretion."). Plaintiff requests these four components of an injunction:

> (1) prohibiting Defendants and those working in active concert with them from further infringement of the cPanel Copyrights and the cPanel Mark and from further sales or distribution of circumvention devices (i.e., illicit licenses);

> (2) prohibiting any service provider (Cloudflare; Google; Porkbun; Private by Design) who provides services with respect to (a) either Defendant or (b) the domain names set forth in Appendix A to cease providing such services upon receipt of notice of the injunction;

PAGE 23 – OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

(3) preventing a transfer of the domains set forth in Appendix A during the pendency of this action or until further order of the Court; and

(4) ordering any company providing payment processing or merchant account services to either Defendant or with respect to any of the domain names set forth in Appendix A to (a) cease providing such services and (b) hold, until further order of the Court, any funds in the account of either Defendant or relating to the domain names set forth in Appendix A (or any associated websites).

PI Mot., ECF 44 at 35–36. Defendant Dashti argues that the Court should "deny the injunctive relief requested in paragraphs (2) and (4) as to him" because they are directed at non-parties. Resp., ECF 57 at 4.

This Court largely agrees with Defendant Dashti and also sees additional issues of law with Plaintiff's requested preliminary injunction. This Court will grant components (1) and (3) because Plaintiff has met the *Winter* factors and because the injunctions will run solely against the named Defendants and those in active concert with them. For the reasons below, however, Plaintiff cannot carry its burden of persuasion on the rest of its proposed preliminary injunction and thus this Court must modify components (2) and (4). *See Norbert v. City & County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) ("A preliminary injunction is an extraordinary remedy. It should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (citations and quotation marks omitted)).

**1. Enjoining Non-Parties (Component (2))**

This Court will not issue component (2) of Plaintiff's requested injunction at this time. That component would have this Court name specific entities—"Cloudflare; Google; Porkbun; Private by Design"—as bound by an injunction. As Plaintiff conceded at oral argument, however, these entities have had no notice of this case nor any opportunity to litigate their rights before this Court, as principles of equity and Federal Rule of Civil Procedure 65 require.

PAGE 24 – OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Rule 65 rests on the premise that "a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may lawfully enjoin the world at large." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (internal quotation marks omitted); *see Trees v. Serv. Emps. Int'l Union Loc. 503*, 570 F. Supp. 3d 954, 962 (D. Or. 2021) (citing cases). Rule 65 accordingly provides that injunctive relief "binds *only* . . . (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described" in subsections (A) and (B). Fed. R. Civ. P. 65(d)(2) (emphasis added). As Google, Cloudflare, Porkbun, and Private by Design have no agency-based relationship with Defendants, only Rule 65(d)(2)(C) is applicable here.

Rule 65(d)(2)(C) is "derived from the commonlaw doctrine that a decree of injunction not only binds the parties defendant but also those identified them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). "In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Id.* Under Rule 65(d)(2)(C), then, for "[a]n injunction [to] bind[] a non-party," the movant must show that the non-party either (i) aided and "abet[ted] the enjoined party in" the unlawful conduct or (ii) "is legally identified with the [defendant]," i.e., in privity with the named defendant. *Consumer Fin. Prot. Bureau v. Howard L., P.C.*, 671 F. App'x 954, 955 (9th Cir. 2016) (citations, quotation marks, and original brackets omitted); *see also Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323–24 (9th Cir. 1998) (aiding and abetting); *Class Plaintiffs v.*

*City of Seattle*, 955 F.2d 1268, 1280 (9th Cir. 1992) (privity). Plaintiff agrees that this is the controlling rule under Rule 65(d)(2)(C).[8] *See* Pl.'s Supp., ECF 71 at 3–4.

Despite this recognition, however, Plaintiff has not explained how Cloudflare, Google, Porkbun, and Private by Design fall under either Rule 65(d)(2)(C) category.

*First*, Plaintiff has nowhere alleged that these service providers are in privity with Defendants. "In this context, privity has come to be seen as a descriptive term for designating those with a sufficiently close identity of interests to justify . . . the enforcement of an injunction against a nonparty." *Nat'l Spiritual Assembly of Baha'is of U.S. Under Heredity Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc.*, 628 F.3d 837, 849 (7th Cir. 2010) (citations and quotation marks omitted). "When privity is invoked as a basis for binding a nonparty to an injunction, it is 'restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding.'" *Id.* (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2956, at 340–41 (2d ed. 1995)); *see United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980) (explaining the same). Plaintiff, however, has not explained how the interests of Google, Cloudflare, Porkbun, and Private by Design have been adequately represented by Defendant Dashti. For failing to do so, Plaintiff cannot receive the injunction it seeks specifically targeting these non-parties.

*Second*, Plaintiff has not explained how Google, Cloudflare, Porkbun, and Private by Design have aided or abetted Defendants in their activities. The Ninth Circuit has defined aiding and abetting under Rule 65 to mean that a non-party must "know[] that [its] conduct is highly

---

[8] Plaintiff concedes that 17 U.S.C. § 512(j) does not confer this Court authority to name non-parties in an injunction. *See* Pl.'s Supp., ECF 71 at 5–7.

PAGE 26 – OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

likely to cause a violation of an injunction." *Inst. of Cetacean Rsch. v. Sea Shepherd Conserv.*

*Soc'y*, 774 F.3d 935, 951 (9th Cir. 2014); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484–

93 (2023) (discussing the application of the common law of aiding and abetting to internet

platforms such as Google, Facebook, and Twitter). Until and unless Plaintiff adequately

addresses aiding and abetting under Rule 65(d), this Court cannot specifically target certain non-

parties in its injunction as Plaintiff asks this Court to do.

      Plaintiff cites several district court cases in support of its requested injunction, but none

persuades this Court. Although those courts enjoined non-parties such as banks and domain hosts

under similar circumstances, their opinions—most of which were produced under heavy time

pressure—do not meaningfully discuss Rule 65(d)(2).[9] *See ABS-CBN Corp. v. Ashby*, Case No.:

3'14-CV-1275 HU, 2014 U.S. Dist. LEXIS 114008 (D. Or. Aug. 8, 2014) (issuing a TRO);

*Amazon Content Servs. LLC v. Kiss Libr.*, NO. 2:20-cv-01048 MJP, 2020 WL 12863507 (W.D.

Wash. Aug. 27, 2020); *Lindsey Adelman Studio, LLC v. Lucretia Lighting Pty. Ltd*, Case No:

1:21-cv-09423, 2021 U.S. Dist. LEXIS 222144 (S.D.N.Y. Nov. 17, 2021) (issuing a TRO); *Trial*

*Film LLC v. Daoai*, No. CV-21-00984-PHX-JJT, 2021 WL 2949508 (D. Ariz. July 14, 2021);

*TVB Holdings USA Inc. v. Enom Inc.*, Case No. SACV 13-624-JLS (DFMx), 2014 WL

12569432 (C.D. Cal. Apr. 22, 2014) (issuing a TRO); *CCA & B v. Anhui Subang Energy*

*Conserv. Tech. Co.*, Civil Action No. 1:23-cv-178-TWT, 2023 U.S. Dist. LEXIS 92319 (issuing

a TRO) (N.D. Ga. Feb. 3, 2023); *Datatech Enters., LLC v. FF Magnat Ltd.*, Case No.: C-12-

---

[9] Conversely, many district courts have refused to bind non-parties to an injunction, citing Rule 65(d). *See, e.g.*, *James v. Scribner*, No. CV 07–880–TUC–RCC, 2010 WL 3942844, at *2 (E.D. Cal. Oct. 4, 2010); *Am. Semiconductor, Inc. v. Cal. Assignments LLC*, Case No.: 12-CV-06138-LHK, 2013 WL 5937968, at *3 (N.D. Cal. Oct. 30, 2013); *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14–03954 DDP (MANx), 2014 WL 4449922, at *3–4 (C.D. Cal. Sept. 10, 2014); *Faunce v. Paulson*, Case No. 6:17-cv-01470-YY, 2017 WL 5560408, at *1 (D. Or. Nov. 17, 2017).

4500 CRB, 2012 U.S. Dist. LEXIS 122257 (N.D. Cal. Aug. 28, 2012) (issuing a TRO); *Liberty Media Holdings, LLC v. FF Magnat Ltd.*, Case No.: 2:12-cv-01057-GMN-RJJ, 2012 U.S. Dist. LEXIS 204811 (D. Nev. June 22, 2012) (issuing a TRO). These cases thus do not supply this Court with the authority to name non-parties in its injunction.

Plaintiff is correct, though, that pursuant to Rule 65(d)(2)(C), a party can request that this Court enforce an injunction against non-parties *after* the injunction has issued. Pl.'s Supp., ECF 71 at 4. After receiving notice of this opinion and the terms of this Court's injunction, a non-party that continues to provide services to Defendants here could possibly qualify as an "aider or abettor" under Rule 65(d)(2)(C). *See Arista Recs., LLC v. Tkach*, 122 F. Supp. 3d 32, 35 (S.D.N.Y. 2015). To that end, this Court will include in its injunction the following order:[10]

> to the extent Plaintiff seeks to have non-parties expressly named in the terms of this injunction, Plaintiff must serve this opinion and injunction to those non-parties and provide them an opportunity to be heard in this Court under Federal Rule of Civil Procedure 65.

In so doing, this Court reiterates that what Plaintiff currently requests as relief—expressly naming Cloudflare, Google, Porkbun, and Private by Design in the injunction—is inappropriate at this juncture. This Court cannot name those non-parties in an injunction absent any argument by Plaintiff that these non-parties have run afoul of Rule 65(d)(2)(C) and absent any notice and opportunity to be heard.

### 2. Asset Freeze & Payment Processing Injunction (Component (4))

Likewise, this Court must modify Plaintiff's requested asset freeze because it is overbroad. As stated above, Plaintiff seeks the following injunction term:

> ordering any company providing payment processing or merchant account services to either Defendant or with respect to any of the domain names set forth in Appendix A to (a) cease providing such

---

[10] This Court does not opine on the applicability of Rule 65 to specific non-parties.

services and (b) hold, until further order of the Court, any funds in
the account of either Defendant or relating to the domain names set
forth in Appendix A (or any associated websites).

This term does not contain a knowledge requirement. Yet Ninth Circuit precedent, as
well as Plaintiff's primary authority in its supplemental brief, require some level of knowledge
for an individual to aid and abet another's wrongdoing. *See Inst. of Cetacean Rsch.*, 774 F.3d at
951; *Arista Recs., LLC*, 122 F. Supp. 3d at 35 ("[A] person who *knowingly* assists a defendant in
violating an injunction subjects himself to civil as well as criminal proceedings for contempt."
(emphasis added) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L.
Hand., J.))); *see also Taamneh*, 598 U.S. at 493 ("The phrase 'aids and abets' . . . refers to a
conscious, voluntary, and culpable participation in another's wrongdoing."). And this Court
cannot enjoin a financial institution solely because it holds assets allegedly connected to the
illicit domains; as the Ninth Circuit has explained, an asset freeze "operates *in personam*, not *in
rem*." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363–64 (9th Cir. 1988) (en banc).
Any financial institution bound by the terms of an asset freeze must be "in active concert" with
Defendants under Rule 65(d)(2)(C). *See supra* at 24–27.

Furthermore, to the extent that Plaintiff requests a freeze of all of Defendants' assets, this
Court will instead narrow the freeze to only those assets associated with infringing domains. *See
Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1049 (9th Cir. 2013) (remanding
injunction to district court for re-wording on the ground that "[i]njunctive relief should be no
more burdensome to the defendant than necessary to provide complete relief to the plaintiffs
before the court" (internal quotation marks, citation, and original brackets omitted)). This Court
therefore cannot issue the injunction as Plaintiff currently phrases it.

That said, this Court will issue an asset freeze over Defendants' assets related to any
infringing domains, and this injunction will be enforced against Defendants and those in active

concert with them. The Ninth Circuit permits asset freezes when the movant shows "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1064 (9th Cir. 2009). The asset freeze can extend to "assets which were controlled by a party, even if that party did not expressly own or possess those assets," *F.D.I.C. v. Garner*, 125 F.3d 1272, 1280 (9th Cir. 1997), and regardless "whether the property be within or without the United States." *S.E.C. v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990) (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965)).

Based on the evidence, there is a high likelihood that Defendants' assets will dissipate in the absence of an injunction. To begin with, Defendants have taken multiple steps to hide their identities and avoid cPanel's scrutiny. Defendants do not provide any contact information on the Category One sites besides an email address; they registered their domains anonymously to the extent that they could; and they have provided false or incomplete addresses to third-party services linked to their domain names. Moreover, Defendants are located abroad, and have moved the operations of their sites before. *See Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, Case No. 5:20-cv-04773-EJD, 2020 WL 5199434, at *10 (N.D. Cal. Aug. 17, 2020) (explaining that courts "routinely . . . grant asset freezes," "when defendants are overseas where they can hide assets from a potential judgment" and citing cases). In total, it follows from the evidence that Defendants will likely move their assets, and accordingly, this Court will preliminarily enforce an asset freeze on those assets Defendants control in relation to any infringing domains.

The injunction will include the following term:

> (a) prohibiting Defendants and those working in active concert
> with them from, until further order of the Court, transferring any
> funds currently in any accounts relating to the Category One and
> Two Domains (and any other domains under Defendant Dashti's

> Porkbun account that sell or advertise illicit cPanel licenses), and
> (b) prohibiting those in active concert with Defendants from
> providing payment processing or merchant account services to
> either Defendant with respect to the Category One and Two
> Domains (and any other domains under Defendant Dashti's
> Porkbun account that sell or advertise illicit cPanel licenses).

To sum up: this Court will grant an asset freeze against Defendants and those who are in active concert with them, but it will not issue an injunction that lacks a knowledge requirement and that indiscriminately freezes all of Defendants' assets.[11]

* * *

Plaintiff has not justified a broad preliminary injunction naming non-parties to this suit, nor an injunction against financial entities who have no knowledge of Defendants' conduct and that extends to all of Defendants' assets.

**D.  Bond: This Court Will Not Issue a Bond**

Defendant Dashti has not sought a bond, and given the willfulness of Defendants' impingement on Plaintiff's intellectual property, this Court will not require one. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.").

**CONCLUSION**

This Court GRANTS in part and DENIES in part Plaintiff's motion for a preliminary injunction. This Court issues the following injunction:

---

[11] This Court does not opine on whether a financial institution could be "in active concert" with Defendants.

(1) prohibiting Defendants and those working in active concert with them from further infringement of the cPanel Copyrights and the cPanel Mark and from further sales or distribution of circumvention devices (i.e., illicit licenses);

(2) prohibiting Defendants and those working in active concert with them from transferring the Category One and Two domains (and any other domains under Defendant Dashti's Porkbun account that sell or advertise illicit cPanel licenses) during the pendency of this action or until further order of the Court;

(3)(a) prohibiting Defendants and those working in active concert with them from, until further order of the Court, transferring any funds currently in any accounts relating to the Category One and Two Domains (and any other domains under Defendant Dashti's Porkbun account that sell or advertise illicit cPanel licenses), and (b) prohibiting those in active concert with Defendants from providing payment processing or merchant account services to either Defendant with respect to the Category One and Two Domains (and any other domains under Defendant Dashti's Porkbun account that sell or advertise illicit cPanel licenses); and

(4) ordering that, to the extent Plaintiff seeks to have non-parties named in the terms of this injunction, Plaintiff must serve this Opinion and injunction to those non-parties and provide them an opportunity to be heard in this Court under Federal Rule of Civil Procedure 65.

**IT IS SO ORDERED.**

DATED this 3rd day of January, 2024.


/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge